DECISION AND JUDGMENT ENTRY
This case is on appeal from the October 6, 1998 judgment of the Lucas County Court of Common Pleas, which sentenced appellant, Timothy Sydnor. Appellant was convicted by a jury of violating R.C.2903.02, murder. On appeal, appellant asserts the following assignments of error:
"FIRST ASSIGNMENT OF ERROR
 "The Court Erred, to The Prejudice of The Defendant-Appellant When it Admitted Numerous Photographs Which Were Unnecessarily Gruesome and Repetitive.
"SECOND ASSIGNMENT OF ERROR
 "Defendant-appellant's Conviction Is Supported by Insufficient Evidence and Is Therefore a Denial of Due Process.
"THIRD ASSIGNMENT OF ERROR
 "Defendant-Appellant's Conviction is Against the Manifest Weight of the Evidence.
"FOURTH ASSIGNMENT OF ERROR
 "Insofar as Any Error Complained of Was Not Adequately Preserved Below, Defendant-Appellant Was Denied the Effective Assistance of Counsel."
Appellant was indicted on one count of murder of Takia Watson in violation of R.C. 2903.02. The following evidence was presented at trial.
A young girl's badly beaten body was discovered on May 27, 1998, about 6:00 a.m. by two women who were on their daily walk through the Inez Nash Park. No one could identify the body, but she was eventually identified as Watson based upon dental records. DNA evidence revealed that sperm samples taken from Watson were from appellant. Paint chips found on Watson's clothing and one knocked-out tooth matched the colors found on a 55-gallon drum garbage can found near her body. There was conflicting evidence as to whether a police investigator and deputy coroner bagged the hands and feet of Watson to preserve evidence.
The deputy coroner testified that, although the exact time of death is always difficult to determine, the evidence in this case indicated that Watson was killed sometime after midnight on May 27, 1998. The coroner described the various injuries Watson suffered. Based upon a reasonable degree of medical certainty, it was the coroner's opinion that Watson was killed by a blunt head injury and strangulation.
Watson had been living for the prior four days with a foster family. The day before her body was found, a foster placement service representative had negotiated a 9:00 p.m. curfew for Watson. Her foster mother did not want her to go out at all. After the meeting, Watson returned to the foster placement service with the representative. When they arrived at the office, a girl approached them and asked Watson why she had taken that girl's pregnancy ultrasound pictures. At first, Watson tried to quiet the other girl. Eventually Watson told her that she wanted to show the pictures to her boyfriend. Later, around 5:15 p.m. or 5:30 p.m., the representative dropped Watson off at a house on Mettler Street.
Dorisea Nickson, testified that Watson was her best friend and that Watson had been at Nickson's house on Mettler Street between 5:30 and 6:00 p.m. the evening before her body was found. After Watson reported in with her foster mother, the two left to walk for fifty minutes to appellant's house. Appellant was Watson's boyfriend. Watson gave instructions to Nickson's mother to tell Watson's foster mother that she was with Dorisea. Watson was wearing a blue jean short, and a blue shirt, and Nike sneakers. Watson left Nickson, and another friend who they picked up along the way, at the corner of Fulton and Delaware Streets while Watson went into Beacon Place to see appellant. Beacon Place is the name of an apartment complex and the name by which the residents refer to the surrounding neighborhood. Inez Nash Park, where Watson's body was discovered, is a part of that neighborhood. Watson and her two friends had arranged to meet at Fulton School at 7:30 p.m., but Nickson and the friend never went to the school and never saw Watson again.
Johnathon Gaines, who lives in Beacon Place and was appellant's friend, testified that he had started hanging around with Watson for only about a week before she died. He recalled that the day before her death, Watson, appellant, appellant's cousin, and Gaines were talking at his place around noon. He also testified that later that day, sometime between 3:00 and 6:00 p.m., Watson and Shakeyla Wright were at Gaines' house. Watson was looking for a ride to Franklin Park Mall. She was wearing a blue starter jacket. She first asked Gaines' mother's boyfriend, Dellmus Colvin, for a ride, but he refused to give her one unless she had more money to pay for the ride. Watson then asked Gaines' sister's boyfriend for a ride, and he said that he would give her a ride later. Around 7:00 p.m., he left to take Gaines' mother on an errand. Watson then said that she was walking over to appellant's house.
Wright confirmed that she was at the Gaines' home around 5:00 p.m. on May 26, 1998. She testified that Watson came over to Gaines' house around 6:00 or 6:30 p.m. wearing a black T-shirt and a blue jean skort. Watson left after thirty minutes stating that she was going to appellant's home. She came back after fifteen minutes stating that she could not get in. Wright recalled Watson staying at Gaines' home for a while, until after it was dark. She then left walking in the direction of appellant's house.
Hope Gaines, Johnathon's sister, testified that she had met Watson about a week before her death. Watson called Gaines around 5:00 or 5:15 p.m. the evening before her body was found and asked if she could come over. Watson arrived sometime around 5:30 p.m. When she arrived, Gaines talked to Watson through an open window, but did not come down. Gaines testified that Watson was wearing a skort and blue and white jacket.
Hope Gaines recalled that Watson was looking for a ride home. Gaines' boyfriend said that he would give Watson a ride after awhile. Around 7:00 p.m., Watson asked to use the phone and Gaines showed her where it was before going upstairs. When Gaines came down, Watson was gone, and Gaines could see her walking through the parking lot toward appellant's house. Several days before this, Watson had indicated to Gaines that she thought she was pregnant. On May 25, 1998, Watson had stated that she was thinking of breaking up with appellant because he smoked too much marijuana and had hit Gaines.
Preston Sproles, Wright's boyfriend, testified that he lived at Beacon Place at the time of the murder and was a close friend of appellant. Sproles testified that appellant had been Watson's boyfriend intermittently for a long time. Late in the evening of Watson's death, Sproles had seen appellant jump out of his window as he usually did when he was breaking his curfew. Appellant was wearing a Michigan jersey, number 23, with an iron stain on it and black and white Jordon sneakers. Sproles also saw Watson come around from the front of the house and join appellant. At the time of trial, he could only recall that Watson was wearing a new outfit with a blue jacket that was similar to one he had seen appellant wear previously. However, when he was interviewed by the police in June, he told them that Watson was wearing a blue jean skort, some new Nike sneakers, and appellant's blue and white Reebok jacket.
Sproles walked with Watson and appellant for a few minutes toward Sproles' house. Sproles left the two and went inside to watch a television show that was already in progress, having started at 12:30 a.m. Wright testified that Sproles arrived at his house around 11:30 p.m. and they watched the show together. Watson and appellant continued on toward the Inez Nash Park stating that they were going to "their spot." At trial, Sproles could not recall if appellant had been drinking. But in a statement to the police in June 1998, Sproles indicated that appellant was talking about drinking, but was not drunk.
Amy Shaner, a Toledo police officer, testified that she responded to a call around 12:12 a.m. from appellant's home about an unwanted person. An older woman who claimed to be the owner of the home wanted her grandson's girlfriend removed because she was causing a disturbance. The call had come in around 11:40 p.m. By the time the officers arrived, the disturbance was over. At first, the woman said that appellant had left with the girl. Since it was after midnight, the officers inquired as to where they were and the woman then said that appellant was in the house, but the officers did not need to speak to him.
Vanessa Sydnor, appellant's mother, testified that she had called the police that evening, but that she called around midnight and that the police did not arrive until after 2:00 p.m. She testified that she had called the police on other occasions when Watson came to see her son because Sydnor thought Watson was a bad influence on her son. Sydnor also learned from her mother that evening that Watson was pregnant. After speaking to the police, Sydnor checked on appellant and found that he had sneaked out of the house by climbing out the window as he had done in the past. She found pillows in the bed, making it look like someone was sleeping, and sheets tied to the bed. She shut the window, without latching it, and went back to bed.
Sydnor was awakened around 3:00 a.m. when appellant returned home and knocked on the door. He said that he had been at Sherman Park alone. However, she testified to the grand jury that appellant had said he was with a group of friends that morning. Sydnor also testified that appellant indicated that he was going to wash his dark-colored nylon jacket. She did not know if it was his or not. The next day, she saw appellant wear the jacket to school, but has never seen it since. The police were unable to locate the jacket. Sydnor testified that appellant often washed his own clothes at 3:00 a.m.
A Toledo police officer and appellant's mother both testified that appellant gave several versions of his activities during the early morning hours of May 27, 1998. First, appellant admitted that Watson had come to his house after he had gone with his grandmother to pick up his mother from work at 11:00 p.m. He said that he had been with Watson and Sproles earlier in the evening. He knew that his mother had called the police about Watson. After the police left, he snuck out of the house to go to Inez Nash Park and then Sherman Park to smoke a cigarette. While passing through the Inez Nash Park, appellant claimed to have seen Watson by the shelter where her body was later found. He called to her and she looked up, but then he walked on. He also saw some drunks in the area and asked them for a cigarette. Then he ran into a couple of friends, Russell Smith and Qudale Williams, and played basketball. When these two persons were interviewed separately, they denied being at the park that night. Qudale Williams testified at trial that he was at home on May 26 27, 1998. Appellant denied having sexual intercourse with Watson that evening. He also stated that he always used a condom whenever he had sexual intercourse with her.
When the police confronted him about lying about certain matters, appellant admitted that he had left home by tying sheets together in order to meet Watson at the Inez Nash Park. Appellant also indicated that he had been with Sproles that evening as well. Sproles later confirmed to the police that they had smoked a cigarette together around 12:30 or 12:45 a.m. After appellant talked to Watson for a while, he became tired and left her there to come home and see if he could get into the house. He said that he had put two paint cans on top of the barbecue grill to crawl back in his window, but he could not reach the window. Sydnor stated that she found the paint cans the next morning. In the process, appellant had gotten his jacket dirty and that is why he had to wash it that night. When appellant could not get in, he went back to the park and saw a man running from the area. The man was wearing black clothing, with a hooded sweatshirt and a bandana over his face, was taller than appellant with a medium build, and was carrying a blunt object. All appellant could tell was that the man had dark-colored skin. Appellant could see the man running from a lump on the ground, which he assumed was Watson. The man pointed at appellant's house indicating that he knew appellant so he better not tell anyone what he had seen. Appellant's house, however, is not visible from the park. Appellant then went home and knocked on the door to get in the house. Appellant told his mother that he had been afraid of the man. He never called the police about Watson.
Appellant explained to the detective that the first story was a lie because he was afraid of the man's threats to him. Later, the detective learned from one of appellant's relatives that appellant's mother had said that she had seen appellant washing his jacket the morning he returned from the park. A search of his home did not produce the jacket, but they did find an extremely clean pair of Nike sneakers that appeared to have been scrubbed clean.
Around 4:00 or 5:00 p.m the day Watson's unidentified body had been found, Johnathon Gaines saw appellant at Sherman Elementary with a group of friends. Gaines' mother suspected that the body found in the park was Watson because she had called Gaines every night and had not called the night before. Gaines said that he made this statement in front of everyone and then questioned appellant since Watson was his girlfriend and she was supposed to be expecting their child. Appellant responded that he did not kill her.
Sproles testified that he went with appellant to the park that day and heard everyone talking about the body found in the park. Appellant made a comment that he did not know anything about it, that he did not do it. At trial Sproles indicated that it was just a normal type of statement for appellant. However, when he was first interviewed by the police in June, Sproles stated that when the group started discussing that Watson had been killed in the park, appellant acted like he did not care. Others began to accuse him, and he said that he did not do it, that he had just left her in the park, and that "at least she got some before she died." Sproles testified that after this incident, appellant disappeared for a few days.
Wright testified that she was part of the group at the school and heard Sproles and appellant talking about Watson. When Johnathon Gaines asked appellant whether he had heard that Watson was found dead in the park, Wright heard appellant say that if it was her, he did not kill her.
Barbra Carswell testified on appellant's behalf. She testified that she is the mother of Hope and Johnathon Gaines. Carswell saw Watson outside the house between 5:30 p.m. and 7:30 p.m. or 8:00 p.m. the evening before her body was found. Watson was asking everyone for a ride. Watson's foster mother called Carswell around 12:10 a.m. and asked about Watson. Ten minutes later the foster mother called again and indicated that Watson had called from a pay phone. Carswell further described the clothing her then live-in boyfriend, Dellmus Colvin, was wearing that evening: a black pair of skorts, a black T-shirt, a light-green jersey, and tan work boots. She also testified that he owns a dark-colored sweatshirt with a hood. She testified that he is a troubled man and that their relationship was stormy. She also described him as being a very large man. She testified that she last saw him around 7:00 p.m. and that he did not come home that night, although he often would spend the night elsewhere. She saw him again the next day after he had been at work and he was wearing his work clothes. Although she usually washed his clothes, she never saw the clothes he had been wearing the night before. On cross-examination, she testified that she was no longer living with Colvin. She also testified that her son, Johnathon, was angry with appellant because appellant had stolen a stereo face out of her home the week before and Johnathon had gone to appellant's house to recover it. Appellant had hit Hope Gaines, in an argument that arose because of these events. She was hit hard enough that Carswell thought her daughter's cheek was broken. Appellant appeared to be wild, with anger and was incredibly full of energy that day.
Barbara Luckett, appellant's aunt, testified that the evening of the day Watson's body was found, relatives of Watson came to her house looking for appellant. Police were called and they were escorted to a relative's home.
Jillene Witty, Watson's foster mother for four days prior to her death, testified that she had told Watson to be home that evening by 7:30 p.m. She first called Nickson's house and discovered that Watson was not there. Then Witty called appellant around 7:00 p.m. and asked him to find Watson and get her on the bus. Appellant called Witty back between 7:30 p.m. and 8:00 p.m. and told her that he had given Watson the message. Witty testified that Watson called at 9:00 p.m. and said that she was at a Kentucky Fried Chicken restaurant at Monroe and Bancroft Streets and was coming home. Witty further testified that appellant's grandmother called again around 11:00 p.m. and said that Watson was at a McDonald's restaurant on Cherry Street.
In his first assignment of error, appellant argues that the trial court erred by admitting into evidence several photographs because they were extraordinarily inflammatory and graphic and were introduced solely for their emotional effect on the jury. Although the record is unclear, it appears that appellant objected at trial to the introduction of four photographs out of the seventeen offered into evidence, specifically: No. 7, the most gruesome photograph of the scene among the seven scene photographs presented (appellant argued that this was a duplicative photograph of the scene, but appellee argued that it was the only scene photograph which showed Watson's face); No. 9, an autopsy photograph, the only photograph showing a close-up image of Watson's damaged teeth and the tongue injuries evidencing strangulation injury (appellant argued that the coroner could testify to such damage without showing the photograph); and, finally, No. 13, an autopsy photograph showing the deep muscles of Watson's neck with blood in them evidencing strangulation, and No. 14, an autopsy photograph of Watson's brain showing the hemorrhages and cerebral contusion (appellant objected on the grounds that the probative value was outweighed by the gruesomeness of the photographs).
On appeal, appellant argues that these photographs were cumulative and were deliberately introduced because of the effect they would have on the jury as shown by the prosecutor's statements during closing argument. These statements were that the jury should view the picture of the dried blood on Watson's face to find that she had been killed hours before her body was discovered and that they should view the photographs of Watson's brain to find that she was hit hard from overhead before she died. Appellant contends that these photographs have no probative value and their introduction into evidence materially prejudiced his case.
Evid.R. 403(A) provides that relevant evidence "* * * is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." With respect to gruesome photographs, the court must determine whether each photograph, although gruesome, has probative value which is not outweighed by any undue prejudice. State v. Woodards (1966), 6 Ohio St.2d 14, 25, certiorari denied (1966), 385 U.S. 930; State v. Moore (Mar. 6, 2000), Stark App. No. 1999CA00126, unreported, at 12-16; State v.Parsons (Jan. 27, 1995), Huron App. No. H-93-47, unreported; andState v. Albanese (Aug. 30, 1985), Sandusky App. No. S-84-32, unreported. The admissibility of evidence is a matter left to the sound discretion of the trial court. State v. Landrum (1990),53 Ohio St.3d 107, 121, certiorari denied (1991), 498 U.S. 1127, andState v. Maurer (1984), 15 Ohio St.3d 239, paragraph seven of the syllabus, certiorari denied (1985), 472 U.S. 1012. Therefore, we will not reverse the trial court's decision unless it is shown that the trial court abused its discretion.
In this case, each photograph depicted a different aspect of the victim's injuries or the crime scene. They are neither repetitive nor cumulative. Furthermore, each photograph supplements the coroner's testimony or the testimony of others regarding the scene. The photographs corroborate evidence relating to how the victim was killed. Appellant's only argument in this case was that the photographs were gruesome. This fact alone is insufficient to establish that the probative value of the photographs were outweighed by any prejudice. The value of these photographs is evident by the very sections of appellee's closing arguments cited to by appellant. Appellant's first assignment of error is not well-taken.
In his second and third assignments of error, appellant argues that his conviction is not supported by sufficient evidence and was contrary to the manifest weight of the evidence.
The concepts of sufficiency of the evidence and manifest weight of the evidence concern different aspects of proving guilt.State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. Review of the sufficiency of the evidence involves a determination as a matter of law of whether the evidence was sufficient to support the jury verdict. Id. at 386. Therefore, viewing the evidence in favor of the prosecution, we must determine if a rational trier of fact would have found that all the essential elements of the crime had been proven beyond a reasonable doubt. State v. Smith (1997), 80 Ohio St.3d 89, 113, certiorari denied (1998), 523 U.S. 1125, citing State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
The concept of manifest weight, however, goes beyond the issue of whether the evidence was legally sufficient. It requires a determination of whether a greater amount of credible evidence was presented to sustain the issues than not. Thompkins, supra at 386-387, and Smith, supra at 114. During this determination we weigh the evidence and all reasonable inferences, assess the credibility of the evidence, and consider whether the jury lost its way in evaluating the evidence and a manifest miscarriage of justice occurred. Id. and Thompkins, supra.
R.C. 2903.02 provides that: "(A) No person shall purposely cause the death of another * * *." Appellant contends that there is no question that Watson was murdered or how it occurred. However, he contends that there was insufficient evidence to link him to the crime. We disagree. There was substantial direct evidence, including appellant's own statements to the police, which place appellant with Watson near the time of her death. While there was no direct evidence that appellant killed Watson, there was circumstantial evidence which proved that appellant had a motive to kill Watson and that he tried to cover up the murder. Therefore, we conclude as a matter of law that there was sufficient evidence to support the jury's conviction.
Furthermore, upon a review of all of the evidence in this case as a whole, we find that the manifest weight of the evidence supports the jury's finding that appellant murdered Watson. We cannot find any basis for concluding that the jury clearly lost its way or that a manifest miscarriage of justice occurred. The jury in this case obviously did not find credible appellant's explanation for the murder of Watson. Under such circumstances, we must uphold credibility determinations made by the fact finder. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Accordingly, we find that the judgment is not contrary to the manifest weight of the evidence. Appellant's second and third assignments of error are not-well taken.
In his fourth assignment of error, appellant contends that if his appointed counsel failed to preserve any prejudicial error, he rendered ineffective assistance of counsel. Since appellant has failed to identify any error or make reference to the place in the record where such error can be found as required by App.R. 12(A)(2) and 16(A)(3), we elect to disregard this assignment of error pursuant to App.R. 12(A)(2).
Having found that the trial court did not commit error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the court costs incurred on appeal.
JUDGMENT AFFIRMED.
 ____________________________ Peter M. Handwork, J., JUDGE
 Melvin L. Resnick, J., Richard W. Knepper, P.J.
CONCUR.